MARY PALEY, as Administratrix of the Estate of MATEY PALEY, Deceased, Respondent, *v.* NEW YORK CENTRAL RAILROAD COMPANY, Appellant.

Third Department, January 7, 1948.

*Whalen, McNamee, Creble & Nichols,* attorneys for appellant.

*Michael LeSawyer,* attorney for respondent.

RUSSELL, J. This is an appeal from a judgment entered in the Columbia County Clerk's Office on May 24, 1947, upon the verdict of a jury, rendered in an action to recover damages for the death of plaintiff's intestate on July 20, 1946. The accident occurred at a grade crossing, known as the Irondale Road crossing, when the automobile owned and operated by the intestate collided with one of the defendant's trains at said crossing.

The railroad is a single-track road, known as the Harlem Division of the New York Central Railroad, and extends from Chatham, Columbia County, to New York City. It runs in a northerly and southerly direction. At the grade crossing the macadam highway, 16 feet wide, crosses the railroad tracks at an angle of 37 degrees from the southeast to the northwest, the direction in which the deceased was driving. This macadam highway parallels the railroad from the village of Millerton northerly, until about 575 feet from the crossing, where it turns to the left or west and continues straight until it crosses. After crossing it continues straight for about 500 to 600 feet where it intersects a main concrete State highway which runs north and south.

The accident happened on the 20th day of July, 1946, shortly before 6:00 P.M., Daylight Saving Time. It was a bright, clear day. The train was a passenger train consisting of an engine and 7 cars, running 29 minutes late.

The railroad track is straight north of the crossing 716.9 feet where it curves to the east 2 degrees, 10 minutes, and extends from said curve north about 200 feet north of the whistling post which is 1,351.6 feet north of the crossing. One can see north from the center of the crossing 1,016.8 feet, which is approximately 300 feet beyond the curve. On the east side of the track 90 feet north of the crossing there is an embankment which varies from 6 feet above the rail at a point 138 feet north of the crossing to 10 feet at a point 625 feet north of

the crossing and 7½ feet at a point 930 feet from the crossing. The top of the bank at a point 130 feet north of the crossing is 31 feet east of the track and at a point 675 feet is 18 feet east of the track and at 930 feet is 26 feet distant. The railroad's right of way is 33 feet wide on either side of the center of the track. There is a pole line on the east side of the track which is located 10 to 11 feet inside of the right of way fence. When one approaches the track proceeding from east to west and reaches a point directly opposite the line of poles, he is 35 feet from the east rail.

The track from north to south is on a descending grade 9½ inches in every 100 feet. At the southeast corner of the intersection there is a cross-arm sign with the words "Railroad Crossing", located on a white post 13.2 feet high. This sign is 14 feet from the track and 9½ feet back from the south edge of the travelled part of the highway. To one traveling from east to west the sign is visible for 575 feet as one approaches the crossing.

Plaintiff's evidence shows there is quite a little traffic over this crossing, consisting mostly of pleasure cars and sometimes small trucks. Occasionally it was used by a big trailer truck, a bus, and school buses. Plaintiff's evidence also shows there was no automatic signal, such as a light or bell, no gates and no flagman.

The plaintiff produced one witness who testified that at a point 27 feet east of the east rail he could see up the track approximately 200 feet. This referred to a sight of the rails and not to an object above the rails. The plaintiff also relies upon the distance one could see up the track from the crossing by the number of poles that are shown in one of the exhibits. The poles are from 80 to 100 feet apart. In this connection it must be taken into consideration that the first pole to be seen is placed some distance north of the crossing, while the last pole located in the exhibit is south of the north part of the curve. The plaintiff contends that from the crossing one cannot see more than 500 feet north on the track.

The civil engineer called by the railroad testified that at a point 66.8 feet from the track there was a view along the track to the north of 337.3 feet. At 45.6 feet the view was 593.9 feet and at 28.7 feet the view had increased to 921.7 feet. These distances were met by observing a man standing in the center of the track and looking north from the crossing from a point on the highway as stated. The height of the locomotive is 13 feet above the rails.

It is, also, the contention of the plaintiff that the grass and brush had grown up to such a height that it obstructed the distance of the view to the north as one approached on the highway from the east. The defendant has offered in evidence photographs to show the extent of the growth of the grass and brush.

As to the speed of the train witnesses were produced by the plaintiff who testified that the train was going approximately 60 to 70 miles an hour. This speed was estimated after the train had crossed the crossing in question. The defendant produced evidence to show by a recording tape that the speed of the train was 54 miles an hour.

The automobile was proceeding according to several witnesses at a speed of from 20 to 25 miles an hour until it neared the railroad tracks when it came almost to a stop and then according to evidence produced by the defendant " seemed to shoot right out in front." The railroad has produced evidence to show that it gave sufficient warning, which was proper and reasonable under the circumstances, of the approach of its train. (*Byrne* v. *N. Y. C. & H. R. R. R. Co.*, 104 N. Y. 362–366.) This evidence was produced not only as a defense of the railroad, but also to establish the contributory negligence of the plaintiff. The defendant produced nine disinterested witnesses, several of whom testified that the whistle blew from the time the train reached the whistling post until it passed through the cut. One of them testified he heard a long screeching blast as the train passed behind the embankment; another heard a long whistle and then a whistle all the way down to the crossing. Others heard it blowing as the train came around the bend to the northwest and heard it blow all the way down. The train crew consisting of the engineer, fireman and conductor testified that four blasts of the whistle were sounded, consisting of two long, one short and one long. The engineer testified that the last long whistle was prolonged. The engineer also testified that he turned on the automatic bell at the whistling post.

With respect to the warning given by the railroad the plaintiff produced five witnesses. Two witnesses testified they heard two blows by the whistle. One of these witnesses was uncertain when the second blow of the whistle was given, and the other said that the second whistle came with the crash; another witness testified that he heard only one whistle, and that between the sounding of the whistle and the crash, eight seconds elapsed. Two other witnesses testified that they heard only one whistle, and one of these witnesses testified that it blew

before the train came to the crossing, but how long before she could not say. The other witness testified that he heard but one whistle, but he could not say where the train was when it blew or whether it blew before or after the accident. The evidence with respect to the warning given by the defendant as its train approached this crossing is convincing that it was a reasonable, proper and timely warning under the circumstances and conditions. However, the question of proper warning was a question of fact for the jury. (*Wadsworth* v. *Delaware, L. & W. R. R. Co.*, 296 N. Y. 206, 211.)

There is some disputed evidence as to whether or not the deceased was familiar with the crossing. The evidence shows that the deceased was a farmer and lived 3 or 4 miles north of the crossing. His wife testified that she had driven on the State road many times with her husband and had observed the railroad track, which is a short distance east of the State road. The defendant produced a witness who testified he had seen the deceased drive up and down the road on which the crossing is located on many occasions.

With respect to the degree of care to be exercised by the deceased under the circumstances and conditions in the instant case, we have as guidance the case of *Proefrock* v. *Denney* (258 App. Div. 5, affd. 283 N. Y. 648) in which case the facts are somewhat similar. It appeared that there was not an entirely clear view until one reached a point at least 27 feet south of the westbound track and upon reaching that point there was an unobstructed view easterly along the tracks of more than 600 feet. In the instant case at a point 28.7 feet there was an unobstructed view north on the tracks of 921.7 feet. In the *Proefrock* v. *Denney* case the court held that there was a total lack of care on the part of the driver. In this case under determination the railroad sign could be seen at a distance of 575 feet from the crossing. As one approached the track from different points east of the track a view was afforded to the driver of an automobile sufficient by the use of ordinary care and by his senses of hearing and sight to have observed the approach of the train. (*Crough* v. *N .Y. Central R. R. Co.*, 260 N. Y. 227.)

As the deceased approached the track the evidence is uncontradicted that he slowed down almost to a stop, and the evidence is also uncontradicted that at that time his car was seen to shoot out or jump. The cause of such an operation of the car remains unanswered. From such facts one might arrive at the hypotheses that he either tried to get across ahead of the train or lost control of his car.

The circumstances and conditions were such in this case that if the deceased in approaching the track had used the ordinary precautions exacted of people in approaching a place. of danger, such as this, he not only could have seen the train but avoided a collision with it. Where the crossing is dangerous, the care should be commensurate with the obvious risk. From all the evidence in this case it clearly appears that the deceased did not take adequate and timely precautions to avoid a collision with the train. (*Wadsworth* v. *Delaware, L. & W. R. R. Co.,* 296 N. Y. 206, *supra; Schrader* v. *N. Y., C. & St. L. R. R. Co.,* 254 N. Y. 148, 152.)

From all the evidence this court is satisfied that the deceased was guilty of contributory negligence as matter of law.

The judgment and order appealed from should be reversed and the complaint dismissed, without costs.

HILL, P. J., and FOSTER, J., concur; DEYO, J., concurs for reversal and votes for a new trial; HEFFERNAN, J., dissents, and votes to affirm, on the ground that the questions of negligence and contributory negligence are for the jury.

Judgment and order reversed on the law and facts, and complaint dismissed, without costs. [See *post,* p. 929.]